**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

DONOVAN CHARLES STONER,

    Plaintiff,

vs.

JAMES STOGNER, *et al.*,

    Defendants.

3:06-cv-00324-LRH (VPC)

**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

November 7, 2007

This Report and Recommendation is made to the Honorable Larry R. Hicks, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the Court is plaintiff's motion for summary judgment (#40). Defendants opposed (#52) and plaintiff replied (#63). Also before the court is defendants' motion for partial summary judgment (#50/51). Plaintiff opposed (#58) and defendants replied (#66). For the reasons stated below, the court recommends that plaintiff's motion for summary judgment (#40) be denied, and defendants' motion for partial summary judgment (#50/51) be granted in part and denied in part.

**I. HISTORY & PROCEDURAL BACKGROUND**

Plaintiff Donovan Charles Stoner, a *pro se* prisoner, is currently incarcerated by the Nevada Department of Corrections ("NDOC") at the Ely State Prison ("ESP") (#1). Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging violations of his First Amendment right to freedom of religion, the First Amendment Establishment Clause, his Fourteenth Amendment right to equal protection of the law, and his rights pursuant to 42 U.S.C. § 2000cc et seq., the Religious Land Use and Institutionalized Persons Act ("RLUIPA").[1] *Id.* Plaintiff names as

---

[1] On April 26, 2005, plaintiff filed this action in the Seventh Judicial District Court of the State of Nevada, in and for the County of White Pine (#1, Exhibit A). Defendants removed this action pursuant to 28 U.S.C. §§ 1441 - 1443 on June 7, 2006 (#1). The court screened and filed plaintiff's complaint pursuant

1  defendants James Stogner, ESP Chaplain; E.K. McDaniel, ESP Warden; Glen Whorton, former
2  NDOC Director; and Jane and John Does. *Id*.

3  Plaintiff practices a religion called "Asatru," which is an NDOC "recognized" religion
4  pursuant to Administrative Regulation ("AR") 810.² *Id*. at 2. Despite recognizing Asatru, AR
5  810 bans what plaintiff alleges is Asatru's "primary religious item known as a 'Hammer' or
6  'Thor's hammer.'" *Id*. Plaintiff claims that Thor's Hammer is used for divine protection for the
7  wearer, to invoke Thor, to define a ritual area, and to swear oaths upon (a "major feature" of
8  Asatru worship). *Id*. at 2-3. Plaintiff alleges that defendants informed him that they banned
9  Thor's Hammer because they consider it a racist symbol. *Id*. at 3. Plaintiff claims that the
10 Christian cross is considered a racist symbol by certain religious groups such as the "Christian
11 Identity" Skinheads, the Klu Klux Klan ("KKK"), and the Aryan Nation; however, defendants
12 have not prohibited wearing the cross. *Id*. Plaintiff alleges that banning Thor's Hammer violates
13 his First Amendment right to freely exercise his religion, his rights under RLUIPA, and his
14 Fourteenth Amendment equal protection rights because NDOC is preferring Christian religions
15 over other religions. *Id*.

16 Plaintiff next alleges that ESP Institutional Policy ("IP") 8.05 violates the First
17 Amendment Establishment Clause. *Id*. at 6. IP 8.05 allows videotapes to "be shown on the
18 closed-circuit television with the approval and assistance of the education department." *Id*.
19 Plaintiff contends that only Christian videos are shown on the closed-circuit channels, which
20 gives the appearance that NDOC is favoring Christianity. *Id*.

21 Next, plaintiff alleges that after prison officials confiscated his personal religious property
22 upon his transfer to ESP and he attempted to replace the items, defendant Stogner informed him
23 that since he had not filled out a Faith Group Affiliation Declaration Form ("affiliation form")
24 declaring his religion, he could not place the order. *Id*. at 10. Plaintiff maintains that he had

---

to 28 U.S.C. § 1915A(a) on January 22, 2007 (#30).

² Asatru is a religious movement which focuses on reviving the Norse beliefs of the Viking Age. *See* http://en.wikipedia.org/wiki/Asatru.

2

previously filled out two affiliation forms at Northern Nevada Correctional Center ("NNCC"), even though defendant Stogner told plaintiff his file did not contain one. *Id.* Moreover, plaintiff alleges that because defendants will not provide him with another affiliation form, nor an Asatru catalog, defendants have violated his freedom of exercise and rights under RLUIPA. *Id.*

Finally, plaintiff alleges that NDOC has an unwritten policy allowing inmates who are in disciplinary detention only one book – the Bible. *Id*. at 12-13. Plaintiff claims this policy prefers Christianity over other religions in violation of the Establishment and Equal Protection Clauses. *Id*.

The Court notes that the plaintiff is proceeding *pro se*. "In civil rights cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II. DISCUSSION & ANALYSIS

**A. Discussion**

**1. Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, __ U.S. __, 126 S.C. 2572, 2576 (2006). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v.*

3

*Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

**B. Analysis**

Plaintiff and defendants have filed cross-motions for summary judgment. The court considers all arguments and evidence together.[3]

**1. Thor's Hammer**

Plaintiff alleges that AR 810's Thor's Hammer ban violates his free exercise rights, his rights under RLUIPA, and the Equal Protection Clause (#1, pp. 3-6). AR 810, entitled "Religious and Faith Group Activities and Programs," establishes NDOC policy and procedure for inmate religious practice (#52, D-MSJ 065-085). AR 810 provides that inmates will have reasonable access to:

> [a]ny special practice, custom, or activity, approved by the Director through the Supervising Chaplain, that is proved, by an outside sponsor or non-prison resource associated with that Faith Group, to be a mandatory tenet or activity required as part of the practice of that religion or faith;...

*Id.*, D-MSJ 067. Inmates are allowed to express their religious beliefs "in appropriate ways that

---

[3] Plaintiff moves for summary judgment on all issues (#40). Defendants move for partial summary judgment on the following claims: (1) plaintiff's First Amendment free exercise claim concerning the Thor's Hammer ban (#50, pp. 20-26); (2) plaintiff's RLUIPA claim concerning the Thor's Hammer ban (#50, pp. 26-27); (3) plaintiff's Establishment Clause claim regarding showing Christian videotapes on state property (#50, pp. 27-29); and (4) the personal participation of defendants McDaniel and Whorton (#50, pp. 29-30).

4

1  are consistent with facility security, safety, health and order," including by wearing "approved
2  medals or medallions." *Id*., D-MSJ 068. Swastikas, iron crosses, inverted crosses, and the Thor's
3  hammer are all prohibited. *Id*.

4  Defendants submit the affidavit of defendant Stogner, who states that AR 810's language
5  prohibiting medallions does not target any particular group of would-be medallion wearers. *Id*.,
6  D-MSJ 103. Defendants also submit the affidavit of Richard Garcia, an Institutional Chaplain
7  at Lovelock Correctional Center ("LCC"), who states that he has specialized knowledge of Asatru
8  as a result of his training and experience. *Id*., D-MSJ 111. Mr. Garcia affirms that "[w]earing
9  a religious medallion know as 'Thor's Hammer' by adherents of Asatru/Odinism is not an
10 inherent part of the exercise and practice of that faith, such that its absence constitutes a
11 substantial burden on their religious exercise...," and that wearing the medallion is a matter of
12 personal preference. *Id*., D-MSJ 112. Mr. Garcia further states that Asatru practitioners may
13 instead wear a widely-used medallion called a "valknut," which has a similar use in Asatru and
14 is not prohibited. *Id*., D-MSJ 113.

15 Plaintiff disputes Mr. Garcia's testimony that the "valknut" is a symbol of equal standing
16 to the Hammer in Asatru (#63). Plaintiff affirms that the valknut is not a symbol he would use
17 for protection, as he would use the Thor's Hammer, and that there is no substitute for Thor in his
18 religious practice (#58, Plaintiff's Affidavit, ¶ 16).

19 Defendants also submit the affidavit of Pam Del Porto, an NDOC Supervisory Criminal
20 Investigator in the Office of the Inspector General, who states that she has specialized knowledge
21 in the prevention and investigation of inmate gang activity. *Id*. D-MSJ 114. Ms. Del Porto
22 affirms that the Thor's Hammer is prohibited because NDOC considers it an identifier for White
23 Supremacists. *Id*. D-MSJ 115. Ms. Del Porto further states that some prisons in the United
24 States, including prisons in Michigan, Pennsylvania, Colorado, and Alabama, have similar
25 prohibitions because "such prisons have reported problems with the use of Thor's Hammer as a
26 symbol of prison gangs adhering to White Supremacist Ideology." *Id*. Ms. Del Porto notes that
27 White Supremacists have been found to exist in the NDOC system. *Id*., D-MSJ 116. Further,
28 Ms. Del Porto states that allowing inmates to wear Thor's Hammer under their clothes is not an

1  acceptable solution because there is a risk that other inmates might force the wearer to reveal the
2  medallion and the wearer could be misunderstood to be a White Supremacist, in the same manner
3  that some inmates force sex offenders to reveal their legal papers. *Id*., D-MSJ 117.  Further,
4  inmates wearing the medallion could "flash" it at other inmates to challenge them, which has been
5  known to lead to gang "turf wars." *Id*.

6       Defendants also submit the affidavit of Greg Cox, the NDOC Deputy Director of
7  Operations, who affirms that because Nevada prisons are overcrowded and recidivism rates are
8  high, NDOC strives to rehabilitate inmates. *Id*., D-MSJ 119-128. Fighting gang-related activities
9  is a high priority in rehabilitating inmates, and banning certain gang symbols, such as Thor's
10  Hammer, is aimed at preventing such activity. *Id*. Mr. Cox states that there is no less restrictive
11  method to accomplish this goal because NDOC does not have the resources to effectively monitor
12  whether inmates are secretly and improperly flashing the medallion at other inmates. *Id*.

13       Plaintiff affirms that he not a White Supremacist, nor is he in a gang, *see* #58, Plaintiff's
14  Affidavit, ¶ 40, and defendants do not dispute this. Plaintiff states that he has worn a Thor's
15  Hammer in the past without incident, *see id*. at ¶ 19; thus, plaintiff argues, there is an issue of fact
16  as to whether wearing the medallion even causes gang-related activity and violence in NDOC
17  prisons (#63). Plaintiff contends that despite the fact that NDOC has not designated the cross as
18  a hate symbol, most people understand that the KKK uses the cross as a hate symbol. *Id*.
19  Plaintiff also argues that because defendants admit that gang-related "flashing" still occurs even
20  without inmates wearing the Thor's Hammer – through gang hand symbols, flashing tattoos,
21  flashing drawings on hats or their hands, and verbally – the goal of stopping gang-related activity
22  has failed. *Id*. Plaintiff contends that because defendants do not identify even one instance in
23  which wearing Thor's Hammer caused gang violence within the NDOC prison system,
24  defendants' argument that there is a compelling reason to ban the medallion is speculative. *Id*.

25            **a. RLUIPA**

26      RLUIPA provides in relevant part:

27          No government shall impose a substantial burden on the religious
          exercise of a person residing in or confined to an institution... even
28          if the burden results from a rule of general applicability, unless the

>government demonstrates that imposition of the burden on that person
>
>(1) is in furtherance of a compelling governmental interest; and
>
>(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "Religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

The plaintiff bears the initial burden to prove that the defendants' conduct places a "substantial burden" on his "religious exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005); *see also Navajo Nation v. United States Forest Service*, 479 F.3d 1024, 1033 (9th Cir., 2007). Once the plaintiff establishes a substantial burden, defendants must prove that the burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest. *Warsoldier*, 418 F.3d at 995. RLUIPA is to be construed broadly in favor of the inmate. *See* 42 U.S.C. § 2000cc-3(g). The Ninth Circuit has set out four factors for the RLUIPA analysis: (1) what "exercise of religion" is at issue; (2) whether there is a "burden," if any, imposed on that exercise of religion; (3) if there is a burden, whether it is "substantial;" and (4) if there is a "substantial burden," whether it is justified by a compelling governmental interest and is the least restrictive means of furthering that compelling interest. *Navajo Nation*, 479 F.3d at 1033-34.

Although RLUIPA does not define "substantial burden," the Ninth Circuit has stated that a substantial burden is one that is "'oppressive' to a 'significantly great' extent. That is, a 'substantial burden, on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier*, 418 F.3d at 995 (*quoting San Jose Christian coll. V. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). The burden need not concern a religious practice that is compelled by, or central to, a system of religious belief, *see* 2000cc-5(7)(A); however, the burden must be more than an inconvenience. *Navajo Nation*, 479 F.3d at 1042 (internal quotations and citations omitted). The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience." *Id*. (internal citations omitted).

Based on the evidence before the court, the court concludes there are genuine issues of

1  material fact as to whether banning Thor's Hammer violates RLUIPA.  RLUIPA requires the
2  court to apply a strict scrutiny test.  Plaintiff clearly meets the first and second factors of the Ninth
3  Circuit RLUIPA analysis – it is not disputed that wearing Thor's Hammer is an "exercise of
4  religion," and that the ban burdens plaintiff's exercise of that religion. *Navajo Nation*, 479 F.3d
5  at 1033-34.

6        Regarding whether the burden on plaintiff's exercise is "substantial," defendants state that
7  for the purposes of plaintiff's motion for summary judgment, "defendants will assume *arguendo*
8  that a fact-issue remains" as to whether the ban creates a substantial burden because "defendants
9  have argued that it does not, and Stoner argues that it does" (#52, p. 23).  The court also
10 independently concludes there exists an issue of fact.  To be "substantial," a burden must prevent
11 the plaintiff "from engaging in [religious] conduct or having a religious experience." *Navajo*
12 *Nation*, 479 F.3d at 1042.  In this case, plaintiff claims he is unable to have a proper religious
13 ceremony without the Thor's Hammer, which he alleges is a "major feature" of Asatru.  While
14 defendants claim there is another symbol plaintiff may use, the "valknut," plaintiff disputes that
15 this symbol is sufficient and of equal status to Thor's Hammer in the Asatru religion.

16       The court additionally concludes that there are issues of fact as to whether there is a
17 compelling reason to have a total ban on Thor's Hammer, and whether a total ban is the least
18 restrictive means possible to achieve the compelling goal.  Plaintiff affirms that he has, in the
19 past, worn the medallion without incident, and defendants do not dispute this.[4]  Notably, as
20 plaintiff points out, defendants have given no examples of specific incidents within NDOC in
21 which security issues have resulted from an inmate wearing a Thor's Hammer.  Defendants'
22 evidence indicates to this court that because Thor's Hammer has been an identifier for White
23 Supremacist ideology in other states' prisons, and because NDOC has, in the past, had White
24 Supremacists within its system, NDOC decided to institute a pre-emptive, absolute ban of Thor's

---

[4] Defendants interpret plaintiff's argument that he wore the medallion "without incident" for years to mean that he did not get "caught" by prison guards for wearing it (#66, p. 9).  However, the court understands plaintiff's argument to be that he wore the medallion without encountering violence at the hands of gangs or White Supremacists, and was additionally never told by guards to remove it.

8

Hammer (#52, D-MSJ 115-116).  What the evidence does not indicate is that Thor's Hammer is a security problem specifically within the NDOC prison system.  It is true that prison security is a compelling state interest for the purposes of RLUIPA.  *Warsoldier*, 418 F.3d at 998.  It is also true that the court must exhibit a "particular sensitivity to security concerns" and be "mindful of the urgency of discipline, order, safety, and security in penal institutions." *Cutter v. Wilkenson*, 544 U.S. 706, 720-23 (2005).  Clearly, stopping gang-related activity is a compelling interest.  However, based on the evidence before the court, the court concludes that there is an issue of fact as to whether the medallion is a security issue within the NDOC prison system.  Indeed, defendants present no evidence that the medallion has caused security incidents; thus, it is not clear that there is any gang-related activity to "stop."  Moreover, even if there is a compelling reason to ban Thor's Hammer, issues of fact remain as to whether a total ban is the least restrictive means possible of achieving that goal.[5]

For the reasons stated above, the court denies both plaintiff's and defendants' motion for summary judgment on the RLUIPA challenge related to banning Thor's Hammer.

### b. Freedom of Religion

Plaintiff next alleges that the Thor's Hammer prohibition arbitrarily denies him the right to freely exercise his religion (#1, pp. 2-6 and 10-12).  Plaintiff's First Amendment claim is governed by a more lenient standard than his RLUIPA claim.  The Supreme Court has held that prison regulations alleged to infringe on prisoners' First Amendment religious rights are judged under the reasonableness standard set out in *Turner v. Safley*, 482 U.S. 78, 85 (1987).  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).  *Turner* sets out a four-part test: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the rights

---

[5] For instance, it is possible that Asatru inmates could wear the medallion only during religious ceremonies which occur in a particular secure location in the prison.  Additionally, other states have procedures in place allowing inmates to apply for an exception to the total ban considering the circumstances of each case.  *See Fisher v. Virginia Dept. of Corrections*, 2007 WL 1552548, *2, n. 4 (W.D. Va., May 25, 2007).  In reviewing an application for such an exception, a case in which an inmate is confined to his cell twenty-three hours per day might not implicate the same "flashing" issues as would a case in which an inmate has access to the general population and the freedom of movement among other inmates.

1  that remain open to prison inmates"; (3) what "the impact accommodation of the asserted
2  constitutional right will have on guards and other inmates, and on the allocation of prison
3  resources generally"; and, (4) whether the "absence of ready alternatives is evidence of the
4  reasonableness of a prison regulation." *Turner*, 482 U.S. at 89-90.

5        The court finds that the Thor's Hammer ban meets the *Turner* standard. There is a valid,
6  rational connection between banning gang symbols and fighting gang-related activity – if gangs
7  have no access to these symbols, it is one less method of "challenging" other inmates. The
8  evidence reveals that plaintiff does have other methods of worshiping, including using the
9  "valknut" instead of the Thor's Hammer to worship, which is not plaintiff's preference, but is an
10 alternative means of worship available to plaintiff. Defendants have provided evidence
11 demonstrating that allowing the Thor's Hammer may increase the likelihood of violence against
12 other inmates and staff such that accommodation of the plaintiff's asserted right could impact
13 guards and other inmates negatively. Finally, the evidence reveals that the most reasonable
14 alternative is a total ban; if an inmate wears the Thor's Hammer under his clothes, the prison
15 cannot guarantee that inmate's safety from other prisoners who might perceive the wearer to be
16 a White Supremacist. *O'Lone*, 482 U.S. at 350 (*quoting Turner*, 482 U.S. at 90-91 ("we have
17 rejected the notion that 'prison officials... have to set up and then shoot down every conceivable
18 alternative method of accommodating the claimant's constitutional complaint'")).

19       The court concludes that there are no issues of material fact as to plaintiff's First
20 Amendment claim. Plaintiff's motion for summary judgment on this issue is denied, and
21 defendants' motion is granted.

22                 **c. Equal Protection**

23       Plaintiff claims that banning Thor's Hammer but not the cross violates the Equal
24 Protection Clause because it gives preferential treatment to Christianity over other religions (#1,
25 pp. 3-4). Prisoners are protected by the Equal Protection clause of the Constitution from
26 intentional discrimination on the basis of their religion, "subject to restrictions and limitations
27 necessitated by legitimate penological interests." *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir.
28 1997). "Prisons must afford an inmate of a minority religion 'a reasonable opportunity of

10

1  pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to
2  conventional religious precepts.'" *Id*. A prison must make good faith accommodations of the
3  prisoner's rights in light of penological and practical considerations. *Id*. To succeed on an equal
4  protection claim, a plaintiff must prove that prison officials intentionally acted in a discriminatory
5  manner. *Id*.

6  Plaintiff alleges that the cross is used as a hate symbol by a number of groups, including
7  the KKK, and maintains that defendant Stogner acknowledged to him verbally that the KKK uses
8  the cross in such a manner (#1, p. 4). Plaintiff contends that despite this, NDOC has not banned
9  the cross. *Id*. Defendants dispute that the cross is used by the KKK or other groups as a "hate
10 symbol," and further note that AR 810 actually bans three types of crosses – the swastika, the
11 inverted cross, and the iron cross (#52, pp. 4 and 8). Defendant Stogner affirms that the Thor's
12 Hammer ban applies equally to all prisoners, regardless of whether they are wearing the medallion
13 for religious or secular purposes. *Id*., D-MSJ 103. Ms. Del Porto affirms that "at this time, the
14 symbol of the cross is not a known Identifier for the Klu Klux Klan ("KKK") or other STG or
15 gangs adhering to White Supremacist ideologies." *Id*., D-MSJ 118.

16 Viewing the evidence in the light most favorable to the non-moving party – the defendants
17 – the court finds that defendants have provided evidence to demonstrate that their purpose in
18 instituting the Thor's Hammer ban was for security reasons. There is no evidence currently
19 before the court to indicate that defendants intended to discriminate against plaintiff based on his
20 religion. Further, there is evidence that at least one symbol associated with Christianity, the
21 inverted cross, has also been prohibited. A reasonable jury could find that the ban was in fact for
22 a secular purpose; thus, the court denies plaintiff's motion for summary judgment.

### 2. Affiliation Form and Azure Green Catalog

24 Next, plaintiff alleges that defendant Stogner refused to give him an affiliation form or
25 a catalog for ordering Asatru religious materials, thereby preventing him from ordering religious
26 items, which violated his free exercise and RLUIPA rights (#1, pp. 10-12).[6]

---

[6] Plaintiff argues in his motion for summary judgment that AR 810's requirement that inmates submit an affiliation form before they may practice their religion "compels affirmation" in violation of the First

11

The evidence reveals that an inmate's affiliation form is not kept a central NDOC file, but in the inmate's personal institutional file ("I-file") (#52, D-MSJ 107). Defendant Stogner affirms that plaintiff's I-file did not contain an affiliation form when plaintiff arrived at ESP, and states that plaintiff could have requested an affiliation form from either him or plaintiff's caseworker. *Id*. Defendant Stogner states that he never received a written request for an affiliation form from plaintiff, and if plaintiff made a verbal request, he does not remember. *Id*. In any event, defendant Stogner notes that plaintiff received an affiliation form in June 2007, when defendant Stogner gave plaintiff the form on advice of counsel. *Id*. Defendant Stogner also affirms that he does not recall plaintiff asking him to contact the Asatru Folk Assembly. *Id*., D-MSJ 109. Defendant Stogner further states that plaintiff does not need a catalog to order religious items, but can send defendant Stogner a "kite" for assistance in ordering. *Id*., D-MSJ 107.

Plaintiff affirms that he requested an affiliation form in writing and verbally numerous times from both defendant Stogner and his caseworker, but never received one (#58, Plaintiff's Affidavit, ¶ 6). Plaintiff submits a number of "Inmate Interview Request" forms dated between December 2005, and March 2006, to demonstrate that he contacted defendant Stogner and his caseworker in writing to obtain an affiliation form and an Azure Green catalog (#1, Exhibits 21-25). However, it is unclear whether defendants received these requests since the forms fail to contain responses. *Id*. Plaintiff affirms that defendant Stogner told him he could not order his religious items without the affiliation form (#58, Plaintiff's Affidavit, ¶ 25). Plaintiff also affirms that defendant Stogner told him on December 12, 2005 that the Asatru catalog was in high demand and that he could have it "next," although plaintiff never received it. *Id*. at ¶ 58. Defendant Stogner allegedly never informed plaintiff that plaintiff could contact defendant Stogner to order religious items without a catalog. *Id*. at ¶ 8. Plaintiff states that even if he had been told this, he does not believe he would be able to order items absent viewing a catalog. *Id*. at ¶ 42.

Viewing the evidence in the light most favorable to the non-moving defendants, the court

---

Amendment (#40, p. 4). Defendants correctly point out that plaintiff did not bring this claim in his complaint, and the court does not address it (#52, pp. 6-7).

concludes that there are genuine issues of material fact as to whether plaintiff requested and was denied an affiliation form and catalog. A reasonable jury could conclude that plaintiff never requested a form, and therefore was not prevented from practicing his religion through ordering and receiving religious materials. Because defendant Stogner argues that he never received a request for a form or a catalog, and plaintiff argues that he did make such requests, there is factual dispute which precludes the court granting plaintiff's motion for summary judgment on this issue.

### 3. Religious Videos

Plaintiff next alleges that ESP IP 8.05, which allows videos to be played on school district equipment, violates the Establishment Clause (#1, pp. 6-10). Defendants move for summary judgment on this claim (#50, pp. 27-29). Plaintiff argues that despite AR 810's edict that "chaplains shall assure equal status of all religions," Christian videos are broadcast to every cell via state property on closed-circuit channels and with state employee assistance pursuant to IP 8.05 (#40, p. 7). He claims that this is not "akin to prisoners choosing to go to the chapel to view a video." *Id*.

Defendants admit that religious videos are shown on the weekends on the closed-circuit television; however, defendants argue that the policy does not favor, advance or inhibit one religion over another (#52, p. 26). Defendants argue, "[g]iven the limited involvement of the prison officials in merely approving the videos for security purposes, and operating the equipment, and the primary role of inmates in securing their own religious videos and licensure, there is no excessive government entanglement in the showing of such videos." *Id*.

The First Amendment prohibits the government from enacting laws "respecting an establishment of religion." U.S. CONST. amend. I. The Establishment Clause is understood to mean that "government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs." *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 590-91 (1989) (footnotes omitted). The Court has adopted a three-part test to determine whether a government has violated the Establishment

13

Clause: (1) whether the government has acted with a secular purpose; (2) whether the primary effect of the conduct is to advance or inhibit religion; and (3) whether the conduct fosters "an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

IP 8.05, entitled "Inmate Worship Services and Related Activities," is intended to establish specific guidelines at ESP for worship and other religious activities (#52, D-MSJ 092-100). IP 8.05 provides that outsiders sending religious materials to ESP must send the materials directly to the ESP chaplain. *Id.*, D-MSJ 098. Videotapes sent from outside sources must be "approved" by the Associate Warden at the request of the chaplain. *Id*. The videotapes may then "be shown on the closed circuit television with the approval and assistance of the education department." *Id*.

Defendant Stogner affirms that he does not prefer that inmates be of any particular faith group, and that he does not engage in favoritism towards any particular religion (#52, D-MSJ 103). He further states that the Chapel operates solely from donated materials and that groups interested in donating materials must contact him in order to send religious items. *Id.*, D-MSJ 104. Defendant Stogner states that more than sixty percent of inmates at ESP declare themselves to be Christians, while only six percent declare themselves to be Asatru. *Id*. While many Christian organizations donate materials to ESP, no Asatru organizations have ever made a donation. *Id*. Defendant Stogner states that all donated materials are "subject to review by the Chaplain (me) and Administration officials to determine the suitability of these materials for distribution." *Id*.

Defendant Stogner further affirms that there are nineteen channels on television, three being ESP closed-circuit channels.[7] *Id.*, D-MSJ 105-106. Of the three, one shows only text, and the other two can show videos. *Id*. Defendant Stogner states that the practice of showing videos on the closed-circuit channels arose through the Mountain High School, an accredited high school operating at ESP to assist inmates in achieving their GED. *Id.*, D-MSJ 106. The practice began

---

[7] The rest of the channels are supplied by the local cable provider (#52, D-MSJ 105-106).

with educational videos and expanded to entertainment videos. *Id*. Defendant Stogner states that inmates are free to request videos to be played on the closed-circuit channels, that ESP does not pick the videos, and that the videos are played only on the weekends by ESP officials, not school district officials. *Id*. Defendant Stogner states that he is willing to assist plaintiff in obtaining videos upon request. *Id*., D-MSJ 107.

Plaintiff disputes that the videos are only shown on weekends, and states that he has kept a log of when the prison shows the videos (#58, p. 6). He cites to examples of videos that send Christian messages and speak in a dismissive manner as to other religions (#40, pp. 8-9).

It is clear that I.P. 8.05 is not secular because its purpose it to establish guidelines for religious worship; therefore, the first prong of the *Lemon* test is not met. *Lemon*, 403 U.S. at 612-13.

With regard to the second prong of the *Lemon* test, the court finds that there is a genuine issue of material fact as to whether the primary effect of showing Christian videos on the closed-circuit television system advances Christianity or inhibits other religions. *Id*. A government practice has the effect of impermissibly advancing or disapproving of religion if it is "sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by nonadherents as a disapproval, of their individual religious choices." *County of Allegheny*, 492 U.S. at 596 (citations omitted). Defendants admit that Christian videos are played on the closed-circuit televisions, but argue that because inmates choose the videos and the videos are all donated, defendants are not advancing religion. The evidence demonstrates that inmates can change the channel, and are not forced to watch the religious programming. However, a reasonable jury could conclude that an inmate who comes upon a religious video playing on the prison's channel could perceive the video to be an endorsement by the prison of that particular religion. Defendants' argument that the reason Christian videos are played is because a majority of the inmates are Christian is not persuasive. Even in the free world, this likely would not be an acceptable argument. For instance, a teacher at an elementary school playing a Christian video on the school's closed-circuit television based on one Christian student's request because sixty percent of the students at that school are Christian would likely be seen as advancing religion.

1  At the very least, it would be an issue of fact.

2  Additionally, defendants' argument that they merely approve the video and play it is also
3  unpersuasive. Defendants are entangling themselves in religion by facilitating the playing of
4  religious videos. That defendants do not choose the videos is not dispositive. There is an issue
5  of fact as to whether this entanglement is "excessive."

6  Since there are issues of material fact as to plaintiff's Establishment Clause claim, the
7  court denies both plaintiff's and defendants' motions for summary judgment.

**4. The Bible in Disciplinary Detention**

9  Plaintiff alleges that NDOC has an unwritten policy of allowing only the Bible in
10 disciplinary detention, which he claims violates the Establishment and Equal Protection Clauses
11 (#1, p. 12). Defendants generally argue that inmates are allowed to receive religious materials
12 of their choice and are not limited to the Bible, *see* #52, p. 26, but do not address the issue of
13 disciplinary detention except through defendant Stogner's affidavit.

14 Defendant Stogner affirms that when he offers books to inmates, his offer is not limited
15 to the Bible. *Id.*, D-MSJ 105. He further states that ESP inmates

> generally are permitted to receive a religious text of their choice
> even when they have had the rest of their property taken away
> from them as a part of a move to disciplinary segregation.
> However, some inmates are not even permitted to receive religious
> materials, such as those on suicide watch or those who have had
> everything, including clothing, removed from their possession.

*Id*.

21 Plaintiff states that he has witnessed defendant Stogner offer free Bibles to inmates to
22 keep, but not offer other religious texts (#58, Plaintiff's Affidavit, ¶ 36). Plaintiff claims to have
23 a "multitude of witnesses" to attest to the practice of allowing only bibles in disciplinary
24 detention, but does not name these inmates (#1, p. 12).

25 Based on the evidence before the court, the court concludes that there is a genuine issue
26 of material fact as to whether defendants allow only the Bible in disciplinary detention. With
27 regard to plaintiff's equal protection claim, if plaintiff's allegations are true, it would appear that
28 prison officials have an unwritten policy of intentionally denying inmates who practice a minority

16

faith the "reasonable opportunity of pursuing [their] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Freeman*, 125 F.3d at 737.

With regard to plaintiff's establishment clause claim, if plaintiff's claims are true, the policy would have the effect of promoting or advancing Christianity. *Lemon*, 403 U.S. at 612-13. There does not appear to be a secular purpose in allowing only the Bible in disciplinary detention. Allowing only the Bible also makes it "sufficiently likely" that inmates will perceive the action as endorsing Christianity and disapproving other religions. *County of Allegheny*, 492 U.S. at 592-94. Because there is an issue of fact, the court denies plaintiff's motion for summary judgment.

### 5. Personal Participation

Defendants McDaniel and Whorton argue that they had no personal involvement in any of the alleged violations (#50, pp. 29-30). Plaintiff contends that because these defendants made and implemented the policies at issue, they personally participated in the alleged constitutional violations. The court agrees.

Liability under section 1983 arises only upon a showing of personal participation by the defendant. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). There is no supervisory liability under section 1983; a supervisor is liable only if he personally participated in or directed constitutional violations, or failed to train or supervise those who did participate. *Id.*; *see also Reed v. Hoy*, 909 F.2d 324, 331 (9th Cir. 1989). However, liability will attach where "the decision maker possesses final authority" to establish policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). This includes unwritten policy, which is also referred to as state "custom or usage." *Id*. at 483, n. 10.

The NDOC Director is the final policymaker for AR 810, which bans Thor's Hammer. Defendant McDaniel signed IP 8.05, which is an ESP specific policy. Further, any unwritten policy at ESP allowing only Bibles in disciplinary detention would presumably be the final decision of the Warden. At the least, this issue is in dispute. The court denies defendants' motion for summary judgment on personal participation.

///

///

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court makes the following conclusions:

- Issues of fact exist as to whether the ban on Thor's Hammer pursuant to AR 810 substantially burdens plaintiff's exercise of religion, whether defendants have a compelling reason to ban the medallion within the NDOC prison system, and whether a total ban is the least restrictive means available;

- AR 810's ban on Thor's Hammer does not violate plaintiff's First Amendment free exercise rights because there is a valid, rational connection between banning gang symbols and fighting gang-related activity, plaintiff has alternative means of worshiping, the use of Thor's Hammer by gangs may increase the likelihood of violence, and the most reasonable alternative is a total ban;

- There is no evidence currently before the court to demonstrate that by implementing the AR 810 ban on Thor's Hammer, defendants intended to discriminate against plaintiff based on his religion;

- There are issues of fact as to whether defendant Stogner denied plaintiff an affiliation form and a catalog to order Asatru items, thereby substantially burdening plaintiff's religious practice in violation of RLUIPA and the Free Exercise Clause;

- There is an issue of fact as to whether ESP's policy pursuant to IP 8.05 allowing mainly Christian videos to be shown on the closed-circuit channels advances the Christian religion and excessively entangles the prison in religion, thereby violating the Establishment Clause;

- There is an issue of fact as to whether defendants have an unwritten policy allowing inmates in disciplinary detention only one book – the Bible – thereby violating the Establishment and Equal Protection Clauses; and

- Defendants Whorton and McDaniel are policymakers and can therefore be held liable for constitutional violations related to those policies.

As such, the court recommends that plaintiff's motion for summary judgment (#40) be denied. The court further recommends that defendants' motion for partial summary judgment (#50/51) be granted as to plaintiff's First Amendment claim with regards to the Thor's Hammer ban, and denied as to plaintiff's RLUIPA claim with regards to the Thor's Hammer ban, plaintiff's Establishment Clause claim with regards to showing videos, and the personal participation of defendants McDaniel and Whorton.

The parties are advised:

1. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days

18

of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that plaintiff's motion for summary judgment (#40) be **DENIED**, and defendants' motion for partial summary judgment (#50/51) be **GRANTED IN PART AND DENIED IN PART**.

**DATED**: November 7, 2007.

*Valerie P. Cooke*
_____
**UNITED STATES MAGISTRATE JUDGE**